DOUGLAS N. LETTER (D.C. Bar No. 253492)
  General Counsel
TODD B. TATELMAN (VA Bar No. 66008)
  Principal Deputy General Counsel
ERIC R. COLUMBUS (D.C. Bar No. 487736)
  Special Litigation Counsel

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
Telephone: (202) 225-9700
Douglas.Letter@mail.house.gov

*Attorneys for Congressional Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Dr. Michael P. Ward, et al., | Case No. 3:22-cv-08015-DJH |
| Plaintiffs, | **CONGRESSIONAL DEFENDANTS' MOTION TO DISMISS** |
| v. | Assigned to: Judge Diane Humetewa |
| Bennie G. Thompson, et al., | |
| Defendants. | |

Defendants the Honorable Bennie G. Thompson and the United States House Select Committee to Investigate the January 6th Attack on the United States Capitol (collectively, the Congressional Defendants) respectfully move for an order dismissing Plaintiffs Michael and Kelli Ward's Complaint (Feb. 1, 2022) (ECF 1).  For the reasons set forth in the accompanying Memorandum of Law, the Wards' Complaint should be dismissed with prejudice.

Dated: August 8, 2022

Respectfully submitted,

*/s/ Douglas N. Letter*
DOUGLAS N. LETTER
  General Counsel
TODD B. TATELMAN
  Principal Deputy General Counsel
ERIC R. COLUMBUS
  Special Litigation Counsel

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES

*Attorneys for Congressional Defendants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

    A.    The January 6th Attack ................................................................................. 2

    B.    The Select Committee's Creation And Subpoena For Plaintiffs' Records ...................................................................................................... 3

STANDARD OF REVIEW ....................................................................................................... 4

ARGUMENT .......................................................................................................................... 5

I.    THIS COURT LACKS SUBJECT MATTER JURISDICTION ................................. 5

II.    THE COMPLAINT FAILS TO STATE A CLAIM ................................................... 6

    A.    The Select Committee Has A Valid Legislative Purpose And The Subpoena Complies With House Rules ................................................. 6

    B.    The Complaint Fails To State A First Amendment Claim ........................... 14

    C.    Neither Arizona State Privilege Protections Nor HIPAA Apply ................... 16

CONCLUSION ..................................................................................................................... 17

# TABLE OF AUTHORITIES

Cases

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).................................................................................4, 5

*Barenblatt v. United States*,
360 U.S. 109 (1959).................................................................................16

*Barker v. Conroy*,
921 F.3d 1118 (D.C. Cir. 2019) ..........................................................8, 14

*Barry v. U.S. ex rel. Cunningham*,
279 U.S. 597 (1929)...................................................................................8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...................................................................................4

*Brock v. Loc. 375, Plumbers Int'l Union of Am., AFL-CIO*,
860 F.2d 346 (9th Cir. 1988) ...................................................................15

*Buckley v. Valeo*,
424 U.S. 1 (1976).............................................................................15, 16

*Budowich v. Pelosi*,
No. 21-3366 (D.D.C.) .................................................................................6

*Doe No. 1 v. Reed*,
561 U.S. 186 (2010).................................................................................15

*Eastman v. Thompson*,
-- F. Supp. 3d --, 2022 WL 894256 (C.D. Cal. Mar. 28, 2022)...........2, 15

*Exxon Corp. v. FTC*,
589 F.2d 582 (D.C. Cir. 1978) .................................................................17

*Keener v. Congress*,
467 F.2d 952 (5th Cir. 1972) .....................................................................5

*Lane v. Peña*,
518 U.S. 187 (1996)...................................................................................5

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)...................................................................................4

*Mayo v. United States*,
319 U.S. 441 (1943).................................................................................16

*McLean v. United States,*
    566 F.3d 391 (4th Cir. 2009) ................................................................5

*Rangel v. Boehner,*
    20 F. Supp. 3d 148 (D.D.C. 2013) ........................................................8

*Republican Nat'l Comm. ("RNC") v. Pelosi,*
    2022 WL 1294509 (D.D.C. May 1, 2022) ....................................6, 11, 12

*Rockefeller v. Bingaman,*
    234 F. App'x 852 (10th Cir. 2007) ........................................................5

*Sadowski v. Bush,*
    293 F. Supp. 2d 15 (D.D.C. 2003) ........................................................4

*Senate Permanent Subcomm. v. Ferrer,*
    199 F. Supp. 3d 125 (D.D.C. 2016) ......................................................15

*Trump v. Thompson,*
    20 F.4th 10 (D.C. Cir. 2021) ....................................................1, 2, 6, 7

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC,*
    933 F.3d 728 (D.C. Cir. 2019) ............................................................10

*United States v. Bannon,*
    No. 21-670 (D.D.C.) ............................................................................6

*United States v. Chem. Found., Inc.,*
    272 U.S. 1 (1926) ................................................................................8

*United States v. Durenberger,*
    48 F.3d 1239 (D.C. Cir. 1995) ............................................................12

*United States. v. Mitchell,*
    463 U.S. 206 (1983) ............................................................................5

*United States v. Reynolds,*
    345 U.S. 1 (1953) ................................................................................7

*United States v. Rostenkowski,*
    59 F.3d 1291 (D.C. Cir. 1995) ..................................................8, 12, 14

*Vander Jagt v. O'Neill,*
    699 F.2d 1166 (D.C. Cir. 1982) ..................................................8, 14

<u>Statutes</u>

26 U.S.C. §§ 8001-05 ................................................................8

42 U.S.C. § 1320 ....................................................................17

<u>Constitution</u>

U.S. Const., Art. I, § 5, cl. 2 ......................................................7

U.S. Const., Art. VI, cl. 2 ........................................................16

U.S. Const., Amend. XII ...........................................................2

<u>Regulations</u>

45 C.F.R. § 160.103-164.502 ..............................................16, 17

<u>Legislative Authorities</u>

165 Cong. Rec. H1216 (daily ed. Jan. 25, 2019) .........................8

167 Cong. Rec. H37 (daily ed. Jan. 4, 2021) ..............................9

167 Cong. Rec. H5760 (daily ed. Oct. 21, 2021) .......................12

167 Cong. Rec. H5768-69 (daily ed. Oct. 21,2021) ...................12

167 Cong. Rec. H7793 (daily ed. Dec. 14, 2021) .......................11

167 Cong. Rec. H7786 (daily ed. Dec. 14, 2021) .......................11

167 Cong. Rec. H7814-15 (daily ed. Dec. 14, 2021) ..................12

168 Cong. Rec. H4217 (daily ed. Apr. 6, 2022) .........................11

168 Cong. Rec. H4371-79 (daily ed. Apr. 6, 2022) ....................12

H. Rep. No. 109-377 (2006) ......................................................9

H. Res. 6, 116th Cong. (2019) .................................................10

H. Res. 24, 110th Cong. (2007) ...............................................10

H. Res. 437, 109th Cong. (2005) ...............................................9

H. Res. 503, 117th Cong. (2021) ................................2, 3, 4, 5, 8, 9, 10, 13

Rules of the U.S. House of Representatives, 117th Cong. (2021) ................8, 9, 13, 14

Rule I...............................................................................................................9

Rule X...............................................................................................................8

Rule XI.......................................................................................................13, 14

The Legislative Reorganization Act of 1946, Pub. L. No. 79-601,
        60 Stat. 812, 831 (1946)...........................................................................13

Other Authorities

Black's Law Dictionary (11th ed. 2019)........................................................10

Brahm Resnik, *'Stop the counting': Records show Trump and allies pressured top
        Maricopa County officials over election results*, 12NEWS (July 2, 2021),
        https://perma.cc/AY9D-DQJZ.....................................................................2

Dr. Kelli Ward (@kelliwardaz), Twitter,
        (Dec. 14, 2020), https://perma.cc/8PPS-H5CZ...........................................3
        (Jan. 6, 2021), https://perma.cc/587H-GGZU ............................................3
        (Jan. 12, 2021), https://perma.cc/5B8S-B6P5.............................................3

Maggie Haberman & Luke Broadwater, *Arizona Officials Warned Fake Electors Plan
        Could 'Appear Treasonous'*, N.Y. Times (Aug. 2, 2022),
        https://perma.cc/67E8-CHCU .....................................................................3

Presidential Memorandum, Procedures Governing Responses to Congressional Requests
        for Information 2-3 (Nov. 4, 1982),
        https://perma.cc/6B6N-FZ89 ......................................................................7

Republican Party of Arizona (@AZGOP), Twitter (Dec. 2, 2020),
        https://perma.cc/A6X3-LPGL.......................................................................3

*Trump's Full Speech at D.C. Rally on Jan. 6*, Wall St. J.,
        https://perma.cc/JGJ3-APMD ......................................................................2

DOUGLAS N. LETTER (D.C. Bar No. 253492)
  General Counsel
TODD B. TATELMAN (VA Bar No. 66008)
  Principal Deputy General Counsel
ERIC R. COLUMBUS (D.C. Bar No. 487736)
  Special Litigation Counsel

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
Telephone: (202) 225-9700
Douglas.Letter@mail.house.gov

*Attorneys for Congressional Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Dr. Michael P. Ward, et al., | Case No. 3:22-cv-08015-DJH |
| Plaintiffs, | |
| v. | **MEMORANDUM OF LAW IN SUPPORT OF CONGRESSIONAL DEFENDANTS' MOTION TO DISMISS** |
| Bennie G. Thompson, et al., | |
| Defendants. | Assigned to: Judge Diane Humetewa |

## INTRODUCTION

In this lawsuit, Plaintiffs Michael and Kelli Ward seek to prevent a validly constituted Congressional committee from "investigating the single most deadly attack on the Capitol by domestic forces" and evaluating the need for legislation to "ensur[e] the safe and uninterrupted conduct of [Congress's] constitutionally assigned business." *Trump v. Thompson*, 20 F.4th 10, 35 (D.C. Cir. 2021), *inj. denied*, 142 S. Ct. 680 (2022), *cert. denied*, 142 S. Ct. 1350 (2022).

Their Complaint provides no valid reason for interference with the Select Committee's critical investigation. The claims by the Wards against the Congressional Defendants are barred by the doctrine of sovereign immunity. And, the Wards' various

- 1 -

claims fail on their merits. *First*, the Wards are wrong that the Select Committee lacks a legitimate legislative purpose or is invalidly constituted. Every court that has considered these arguments has rejected them. *Second*, the Wards' First Amendment rights are not violated by the subpoena. *Third*, neither Arizona state law nor the federal Health Insurance Portability and Accountability Act ("HIPAA") shields from the Select Committee the information encompassed by the subpoena.

In short, the Complaint presses a variety of flawed legal claims to thwart the Select Committee's efforts to understand fully, and to prevent a recurrence of, the events of January 6th. This Court should dismiss the Complaint in its entirety.

## BACKGROUND

### A.    The January 6th Attack

On January 6, 2021, rioters seeking to stop the peaceful transfer of power following the 2020 Presidential election launched a violent assault on the United States Capitol. H. Res. 503, 117th Cong. (2021). These rioters impeded the constitutionally-mandated counting of electoral college votes transmitted from the states, which reflected the results of the 2020 presidential election. *See* U.S. Const., Amend. XII. President Trump "attempt[ed] to obstruct" this count by, in part, directing the assembled crowd of supporters to the Capitol to pressure Vice President Pence and the federal legislators to reject the certified results of the election.[1] "The rampage left multiple people dead, injured more than 140 people, and inflicted millions of dollars in damage to the Capitol." *Trump v. Thompson*, 20 F.4th at 15.

Dr. Kelli Ward participated in multiple aspects of these attempts to interfere with the electoral count on January 6th. She told officials in Maricopa County to stop counting

---

[1] *Eastman v. Thompson*, No. 22-99, 2022 WL 894256, at *20-21 (C.D. Cal. Mar. 28, 2022); *See, e.g.*, *Trump's Full Speech at D.C. Rally on Jan. 6*, Wall St. J., at 14:35-15:47, https://perma.cc/JGJ3-APMD.

ballots,[2] and promoted inaccurate allegations of election interference by Dominion Voting Systems.[3]  Although the Governor of Arizona had certified that Joseph Biden won the election in Arizona and that the Biden electors would represent the state of Arizona, Dr. Kelli Ward (while serving as the Chair of the Arizona Republican Party, Compl. Ex. B ¶ 8, ECF 1-2), and other Trump electors nevertheless convened as Arizona's purported electors, voted, and sent a set of unauthorized Electoral College votes to Congress that she misdescribed as "represent[ing] the legal votes of Arizona[.]"[4]  Privately, she reportedly expressed concern about the legality of this effort to representatives of President Trump.[5]  Nevertheless, while Congress was recessed due to the mob's violence and attack on the Capitol, Dr. Ward continued to advocate for overturning the results of the election.[6]  And in the wake of January 6th, Dr. Ward continued to falsely maintain that the illegitimate document purporting to transmit Electoral College votes for Donald Trump contained "the rightful & true Presidential electors for 2020."[7]

**B.    The Select Committee's Creation And Subpoena For Plaintiffs' Records**

In response to the unprecedented January 6th attack, the House of Representatives adopted House Resolution 503, "[e]stablish[ing] the Select Committee to Investigate the January 6th Attack on the United States Capitol" ("Select Committee").  H. Res. 503 § 1. This resolution authorizes the Select Committee to (1) "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol" and

---

[2]  Brahm Resnik, *'Stop the counting': Records show Trump and allies pressured top Maricopa County officials over election results*, 12NEWS (July 2, 2021), https://perma.cc/AY9D-DQJZ (quoting Ms. Ward's text messages).

[3]  *See* Republican Party of Arizona (@AZGOP), Twitter (Dec. 2, 2020), https://perma.cc/A6X3-LPGL.

[4]  Dr. Kelli Ward (@kelliwardaz), Twitter (Dec. 14, 2020), https://perma.cc/8PPS-H5CZ.

[5]  *See* Maggie Haberman & Luke Broadwater, *Arizona Officials Warned Fake Electors Plan Could 'Appear Treasonous'*, N.Y. Times (Aug. 2, 2022), https://perma.cc/67E8-CHCU.

[6]  Dr. Kelli Ward (@kelliwardaz), Twitter (Jan. 6, 2021), https://perma.cc/587H-GGZU.

[7]  Dr. Kelli Ward (@kelliwardaz), Twitter (Jan. 12, 2022), https://perma.cc/5B8S-B6P5 (replying to a comment on her original tweet).

relating to the interference with the peaceful transition of power"; (2) "identify, review, and evaluate the causes of and the lessons learned from the domestic terrorist attack on the Capitol;" and (3) "issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures … as it may deem necessary." *Id.* §§ 3(1), 4(a)(1)-(3).

In furtherance of its duty to "investigate the facts, circumstances, and causes" of the January 6th attack, the Select Committee has issued subpoenas to various entities, including to T-Mobile USA, Inc. ("T-Mobile"), for call detail records relating to Ms. Ward's account (Compl. Ex. A at 2, ECF 1-1).[8]

## STANDARD OF REVIEW

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), a plaintiff has the burden of establishing this Court's jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). In determining whether it has jurisdiction, the Court "must take all of the factual allegations in the complaint as true," and are "are not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation and quotation marks omitted).

"Moreover, the court need not limit itself to the allegations of the complaint … . Rather, the court, where necessary, may consider the complaint supplemented by undisputed facts along with the court's resolution of disputed facts to determine whether it has jurisdiction over the case." *Sadowski v. Bush*, 293 F. Supp. 2d 15, 17 (D.D.C. 2003), *dismissed as moot*, No. 03-5189, 2004 WL 547605 (D.C. Cir. Mar. 17, 2004).

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

---

[8] According to the representations in Dr. Ward's Affidavit, (Compl. Ex. B ¶ 17), Dr. Michael Ward and two children have phone numbers associated with the account that was the subject of the Subpoena. To the extent call detail records for those phone numbers are considered covered by the Subpoena, the Select Committee has voluntarily withdrawn such a demand and has notified T-Mobile accordingly. Therefore, in addition to requiring dismissal for the reasons stated in this memorandum, Dr. M. Ward's claims are also moot.

face.'" *Ashcroft*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

**ARGUMENT**

This Court lacks subject matter jurisdiction to consider the Wards' claims against the Select Committee and Chairman Thompson because those claims are barred by the doctrine of sovereign immunity. In any event, all of the Wards' claims are meritless. Indeed, many of the Wards' arguments have been correctly rejected by multiple federal courts, and the Wards offer no valid reason for this Court to hold differently. The Wards' Complaint should be dismissed.

## I.     This Court Lacks Subject Matter Jurisdiction

This suit is barred by the doctrine of sovereign immunity because "the United States may not be sued without its consent and ... the existence of consent is a prerequisite for jurisdiction." *United States. v. Mitchell*, 463 U.S. 206, 212 (1983). That protection applies to Congress as well. *See Keener v. Congress*, 467 F.2d 952, 953 (5th Cir. 1972); *McLean v. United States*, 566 F.3d 391, 401 (4th Cir. 2009). Accordingly, sovereign immunity "forecloses ... claims against the House of Representatives and Senate as institutions, and Representative[s] ... and Senator[s] ... as individuals acting in their official capacities." *Rockefeller v. Bingaman*, 234 F. App'x 852, 855 (10th Cir. 2007).

Plaintiffs like the Wards seeking to sue the Federal Government bear the burden of identifying an applicable waiver of sovereign immunity that is "unequivocally expressed in statutory text." *Lane v. Peña*, 518 U.S. 187, 192 (1996) (waiver "will not be implied"). The Complaint here does not and cannot point to any such waiver. Nor can the Select Committee's actions be considered *ultra vires*; after all, the Select Committee's investigation, and attendant subpoenas, were clearly and expressly authorized by the full House and are consistent with its standing rules. *See* H. Res 503 §§ 3(1), 5(c). Because no waiver of sovereign immunity applies, the claims against the Congressional Defendants must be dismissed.

## II. The Complaint Fails To State A Claim

Even if the Wards could overcome the jurisdictional bar of sovereign immunity, their Complaint does not state a claim on which relief can be granted. *First*, the D.C. Circuit has correctly held that the Select Committee has a valid legislative purpose, and that purpose undoubtedly encompasses the subpoena to T-Mobile at issue here. Further, the Select Committee is validly constituted, as other courts have uniformly held, and the subpoena to T-Mobile complies with the applicable House rules and the Select Committee's authorizing resolution. *Second*, the Wards' First Amendment claim fails. *Third*, health privacy statutes, including HIPAA, do not shield the information that the subpoena seeks. This suit should therefore be dismissed.

### A. The Select Committee Has A Valid Legislative Purpose And The Subpoena Complies With House Rules

**1.** As the D.C. Circuit recently held, "the January 6th Committee plainly has a valid legislative purpose and its inquiry concern[s] a subject on which legislation could be had." *Trump v. Thompson*, 20 F.4th at 41 (alteration in original) (internal quotation marks and citation omitted). In reaching this holding, the D.C. Circuit described "Congress's uniquely vital interest in studying the January 6th attack on itself to formulate remedial legislation and to safeguard its constitutional and legislative operations." *Id.* at 17. Applying the D.C Circuit's decision in *Trump v. Thompson*, four other courts have rejected similar arguments that subpoenas issued by the Select Committee lacked a legitimate legislative purpose. *See* Oral Arg. Tr. at 119:19-121:4, *United States v. Bannon*, No. 21-670 (D.D.C. June 15, 2022); *Republican Nat'l Comm.* ("*RNC*") *v. Pelosi*, No. 22-659, 2022 WL 1294509, at *16-19 (D.D.C. May 1, 2022); Oral Arg. Tr. at 34, *Budowich v. Pelosi*, No. 21-3366 (D.D.C. Jan. 20, 2022), ECF 27; Order Den. Pl.'s Mot. for Prelim. Inj. at 10, *Eastman v. Thompson*, No. 22-CV-00099 (C.D. Cal. Jan. 25, 2022), ECF 43. No court has ruled otherwise.

Nonetheless, the Wards repeatedly insist that the Select Committee's subpoena does not serve a valid legislative purpose, arguing that the subpoena "appears to facially serve

- 6 -

the purpose of law enforcement" and "is being used as a general power of inquiry." Compl. ¶¶ 43-44. But the Select Committee is not criminally investigating the Wards or anyone else—nor is the Select Committee, by investigating the January 6th attack, trying to "expose [information] for the sake of exposure." Compl. ¶ 45. Indeed, the D.C. Circuit rejected this very argument noting that "[t]he mere prospect that misconduct might be exposed does not make the [Select] Committee's request prosecutorial. Missteps and misbehavior are common fodder for legislation." *Trump v. Thompson*, 20 F.4th at 42. The Wards' Complaint offers no sound reason for this Court to reach a different conclusion.[9] And Dr. Kelli Ward's extensive efforts at overturning the Presidential election, *see supra* at 2-3, provide ample basis for issuing the subpoena.

**2.** The Complaint also alleges that the Select Committee was not validly formed and lacked authority to issue the subpoena to T-Mobile for the Wards' records. *See* Compl. ¶¶ 74-91. Those contentions are wrong as a matter of law.

Through this claim, the Wards demand that this Court override the actions of the House and its Speaker for assertedly not following the Select Committee's authorizing resolution or House Rules violates Constitutional separation of powers principles. The Constitution's Rulemaking Clause states that "[e]ach House may determine the Rules of its Proceedings." U.S. Const., Art. I, § 5, cl. 2. As the D.C. Circuit has explained, the Clause

---

[9] The Complaint makes a single, passing reference to executive privilege as a ground upon which the Select Committee's subpoena is invalid. *See* Compl. ¶ 36. However, the Wards are not the holder of executive privilege and, therefore, cannot assert it. Executive privilege "belongs to the Government and must be asserted by it," and there must be a "formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer." *United States v. Reynolds*, 345 U.S. 1, 7-8 (1953); *see also* Presidential Memorandum, Procedures Governing Responses to Congressional Requests for Information 2-3 (Nov. 4, 1982), https://perma.cc/6B6N-FZ89 ("If the President decides to invoke executive privilege, the Department Head shall advise the requesting Congressional body that the claim of executive privilege is being made with the specific approval of the President."). Because the Wards haven't alleged that President Trump even attempted to invoke executive privilege regarding their telephone records and because they lack any legitimate claim to executive privilege even if he had, the privilege cannot be relied upon as a basis to challenge the Select Committee's subpoena.

- 7 -

"'clearly reserves to each House of the Congress the authority to make its own rules,' and ... interpreting a congressional rule 'differently than would the Congress itself' is tantamount to '*making* the Rules—a power that the Rulemaking Clause reserves to each House alone.'"  *Barker v. Conroy*, 921 F.3d 1118, 1130 (D.C. Cir. 2019) (quoting *United States v. Rostenkowski*, 59 F.3d 1291, 1306-07 (D.C. Cir. 1995)); *see also Rangel v. Boehner*, 20 F. Supp. 3d 148, 167 (D.D.C. 2013).  Indeed, it is a "startlingly unattractive idea, given [courts'] respect for a coequal branch of government, for [a federal court] to tell the Speaker" whom to appoint to committees.  *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1176 (D.C. Cir. 1982) (internal quotation marks omitted).

In addition, the arguments advanced by the Wards ignore the presumption of regularity due Congress.  *See Barry v. U.S. ex rel. Cunningham*, 279 U.S. 597, 619 (1929) ("The presumption in favor of regularity ... cannot be denied to the proceedings of the houses of Congress, when acting upon matters within their constitutional authority.").  None of the allegations in the Complaint comes close to demonstrating the "clear evidence to the contrary," *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926), required to overcome that presumption.

Regardless, the various challenges to the Select Committee's composition and issuance of the subpoena are deeply flawed.  *First*, the Complaint contends that Speaker Pelosi's appointment of nine instead of thirteen Members to the Select Committee, and appointment of Members different from those recommended by the Minority Leader, was contrary to the Select Committee's authorizing resolution.  *See* Compl. ¶¶ 76-78.  That claim is incorrect.

By way of background, the House has four different kinds of committees, each of which is established and governed by various House Rules, statutes, and House resolutions, or on an *ad hoc* basis.  *See, e.g.*, Rule X, Rules of the U.S. House of Representatives, 117th Cong. (2021) ("House Rules") (rules governing "standing" Committees); 26 U.S.C. §§ 8001-05 (establishing the Joint Committee on Taxation); H. Res. 503 § 1 (establishing the Select Committee); 165 Cong. Rec. H1216 (daily ed. Jan.

25, 2019) (appointment of conferees for H.J. Res. 31).  The House rules and procedures governing appointments to these four distinct types of committees vary.  Significantly, under House rules, the Speaker appoints Members for all select committees, including the one at issue here.  *See* House Rule I.11 ("[t]he Speaker shall appoint all select, joint, and conference committees ordered by the House.").  And, by unanimous consent, on January 4, 2021, the House expressly authorized the Speaker to "make appointments authorized by law or by the House."  167 Cong. Rec. H37 (daily ed. Jan. 4, 2021) (statement of Rep. Hoyer).

The Wards' attack on the composition of the Select Committee fails.  House Resolution 503 states that "[t]he Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader."  H. Res. 503 § 2(a).  The plain language of the resolution does not require that *all* thirteen Members be appointed for the Select Committee to function, and the Congressional Defendants are aware of no rule or law providing that the authorization to appoint thirteen Members required that the Speaker appoint that precise number.

Indeed, the House's interpretation of its rules is strongly informed by prior practice, and precedent supports a House select committee operating with fewer than its full allotment of Members.  Specifically, in the 109th Congress, the House created the Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, which allowed for twenty members, using language substantially similar to the Resolution here.  *See* H. Res. 437, 109th Cong. § 2(a) (2005) ("The select committee shall be composed of 20 members appointed by the Speaker[.]").  Then-House Speaker Dennis Hastert appointed only eleven Members, all of whom were from the then-majority Republican Party.  *See* H. Rep. No. 109-377, at ii (2006) (listing Members).  Notably, that select committee likewise issued subpoenas.  *See id.* at 23.  This precedent strongly supports the Speaker's actions here.

Moreover, House Resolution 503 contemplates the possibility of "vacancies" but provides no specific timeline for filling them.  *See* H. Res. 503 § 2(c).  Nor does House

Resolution 503 provide that the Select Committee would become invalid, or that it must suspend all action, should a vacancy occur—even though, by definition, it would have fewer than thirteen members. *See id.* In short, the Speaker's appointment of nine Members to the Select Committee is fully consistent with House Resolution 503. *See infra* at 12-13.

Likewise, contrary to the Wards' suggestion, *see* Compl. ¶ 78, the Select Committee's composition complies with the authorizing resolution's requirement that Members be chosen "after consultation with the minority leader." H. Res. 503 § 2(a). The plain language of the resolution does not, for example, authorize the Minority Leader to directly appoint a certain number of Members, nor does it require that appointments be made "upon the recommendation" of the Minority Leader. Instead, the resolution provides the Speaker with the broader authority to simply "consult[]" with the Minority Leader regarding the appointment of minority party Members. *See United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 750 (D.C. Cir. 2019) ("Consultation" means to "seek[] advice or information of" (internal quotation marks omitted)); *Consultation*, Black's Law Dictionary (11th ed. 2019) (defining "consultation" as "[t]he act of asking the advice or opinion of someone"). The Minority Leader's refusal to consult further after the Speaker declined to appoint two of his recommendations does not alter the authority under House Resolution 503. Neither the Speaker nor the full House has interpreted House Resolution 503 to allow the Minority Leader to unilaterally frustrate the operation of the Select Committee. Indeed, no reasonable interpretation of House Resolution 503 would so allow.

Had the House intended a binding role for the Minority Leader, it could have provided for such a requirement, as it has in the past. *See* H. Res. 6, 116th Cong. § 104(f)(1)(B) (2019) (Select Committee on the Climate Crisis requirement that a portion of the Members be appointed by the Speaker "on the recommendation of the Minority Leader"); *id.* § 201(b)(3) (same requirement for Select Committee on the Modernization of Congress). Similarly, had the House wished to delegate appointment power directly to the

Minority Leader, it could have done so. *See, e.g.*, H. Res. 24, 110th Cong. § 2(a) (2007) (creating the House Democracy Assistance Commission and allowing nine Members to "be appointed by the Minority Leader of the House of Representatives").

Here, House Resolution 503 was followed: the Minority Leader *was* consulted. The fact that the Speaker—using the authority provided to her by the House Rules; the January 4, 2021, Order of the House; and House Resolution 503—indicated she would only appoint three of his initial five selections, and that the Minority Leader subsequently withdrew his recommendations, does not make the Select Committee improperly constituted, nor does it invalidate any of its actions.

It is thus no surprise that every district court to have considered challenges to the Select Committee's composition has rejected them. As a district court recently explained in *RNC v. Pelosi*, "the House views the Select Committee to be duly constituted and empowered to act under its authorizing resolution, even though the Select Committee has only nine members. This understanding is reflected by the House's adoption of the Select Committee's recommendations to find witnesses in contempt of Congress for their refusals to comply with Select Committee subpoenas." 2022 WL 1294509, at *15. Indeed, the full House affirmatively ratified the relevant actions of the Select Committee in the face of challenges on the House floor identical to the challenges raised by the Wards' here.

For example, when the full House debated the resolutions recommending referral of Stephen Bannon, Mark Meadows, Peter Navarro, and Daniel Scavino, Jr. for contempt of Congress for failure to comply with Select Committee subpoenas, several Members of Congress raised the argument about the composition of the Select Committee.[10] The full

---

[10] *See, e.g.*, 167 Cong. Rec. H7793 (daily ed. Dec. 14, 2021) ("This committee is illegitimate. … It has violated its own rules of creation and it says they want to find out this massive truth here about what happened on January 6. … You can't do that. And that is what they are doing today." (statement of Rep. Biggs)); *id.* at H7786 ("the committee has zero members appointed in consultation with Leader McCarthy" and "it doesn't have 13 members." (statement of Rep. Banks)); *see also* 167 Cong. Rec. H5760 (daily ed. Oct. 21, 2021) ("the subpoenas that have so far been issued do not ask for information that would meet any legitimate legislative purpose." (statement of Rep. Banks)); 168 Cong.

House nonetheless approved the Select Committee's referrals of those four individuals for contempt of Congress.[11]  The House's ratification of the referrals reinforces that the Wards' objections to the Select Committee's composition fail.

In rejecting the argument that House rules mandated that the Speaker appoint thirteen Members to the Select Committee, the *RNC* court further explained that the fact "that [House Resolution 503 § 2(a)] states that Speaker Pelosi 'shall' appoint thirteen members to the Select Committee is not conclusive as to whether thirteen members are required for it to lawfully operate."  2022 WL 1294509, at *15.  The court concluded that if it accepted the challenge to the Select Committee's composition, it "would be 'interpret[ing] the Rule differently than ... the [House] itself' and 'would effectively be making the Rules—a power that the Rulemaking Clause reserves to each House alone.'"  *Id.* (alteration in original) (quoting *Rostenkowski*, 59 F.3d at 1306-07).

Three other district courts have rejected substantially similar challenges to the composition of the Select Committee.  In *Budowich v. Pelosi*, the court determined that it must "defer to Congress in the manner of interpreting its rules," and that it would be "usurping Congressional authority" to hold that the Select Committee was not validly composed.  Oral Arg. Tr. at 34, *Budowich*, ECF 27.  Shortly thereafter, Judge Carter of the Central District of California likewise recognized the deference owed to the Speaker, the full House, and the Select Committee in interpreting a House resolution.  As Judge Carter explained, "[a] court may interpret internal congressional rules only when such interpretation 'requires no resolution of ambiguities.'"  Order at 9 & n.12, *Eastman*, ECF 43 (quoting *United States v. Durenberger*, 48 F.3d 1239, 1244 (D.C. Cir. 1995)).  Most recently, in denying Stephen Bannon's motion to dismiss his indictment for contempt of

---

Rec. H4217 (daily ed. Apr. 6, 2022) (challenging the Select Committee's means of operation during the full House debate over the contempt resolution relating to Peter Navarro and Daniel Scavino, Jr.).

[11] *See, e.g.*, 167 Cong. Rec. H7814-15 (daily ed. Dec. 14, 2021) (vote on H. Res. 851, Meadows); 167 Cong. Rec. H5768-69 (daily ed. Oct. 21,2021) (vote on H. Res. 730, Bannon); 168 Cong. Rec. H4371-79 (daily ed. Apr. 6, 2022) (vote on H. Res. 1037, Navarro and Scavino).

Congress, a district court rejected his challenge to the composition of the Select Committee. The court recognized that it "must give great weight to the interpretation of those House members charged with implementing the [authorizing] resolution and to the House itself," and "there would be potential separation of powers issues, should this or any court reject a congressional interpretation of its own rule." Oral Arg. Tr. at 115:7-24, *Bannon*, No. 21-670.

*Second*, the Wards claim that the subpoena was improperly issued because it was not issued at a meeting of the Select Committee at which a majority, or quorum, of the Select Committee Members were present. *See* Compl. ¶¶ 74-91. This argument misunderstands and misapplies the applicable House Rules.

The Wards incorrectly rely on the House Rule requiring that a "measure ... may not be reported by a committee unless a majority of the committee is actually present." *Id.* ¶ 79 (citing House Rule XI.2(h)(1)). The term "measure" does not encompass a committee subpoena. Rather it is a synonym for a bill, resolution, or report, which is consistent with its use in the Legislative Reorganization Act of 1946, from which this requirement originated. *See* Pub. L. No. 79-601, § 133(d), 60 Stat. 812, 831 (1946). This rule is inapplicable to the issuance of subpoenas because a separate quorum requirement is found in House Rule XI.2(m)(3)(A).

Furthermore, the Wards misapply House Rule XI.2(m) regarding the issuance of subpoenas. While noting that the Rule states that subpoenas may be issued "only when authorized by the committee or subcommittee, a majority being present," *see* Compl. ¶ 82, they omit the next sentence, which provides an alternative method for issuance: "The power to authorize and issue subpoenas under subparagraph (1)(B) may be delegated to the chair of the committee under such rules and under such limitations as the committee may prescribe." House Rule XI.2(m)(3)(A)(i). Compounding this error, the Wards incorrectly assert that "H. Res. 503 did not change the requirement of House Rule XI, clause 2(m) that a majority of the issuing committee be present to authorize issuance of any subpoena." Compl. ¶ 83. In fact, House Resolution 503 expressly invokes the

provision of Rule XI.2(m)(3)(A)(i) by stating that the "chair of the Select Committee may authorize and issue subpoenas pursuant to clause 2(m) of [House] rule XI[.]"  H. Res. 503 § 5(c)(4).  Because House Resolution 503 specifically delegates to the Chairman of the Select Committee the power to authorize and issue subpoenas, it is consistent with House Rule XI.2(m)(3)(A)(i) and does not require either a meeting or the presence of a quorum.

In short, there is no basis for this Court to substitute the Wards' interpretation of the Select Committee's authorizing resolution for the House's view; indeed, such a determination would be impermissibly "tantamount to 'making the [House] Rules.'" *Barker*, 921 F.3d at 1130 (emphasis omitted) (quoting *Rostenkowski*, 59 F.3d at 1306-07); *see also* Oral Arg. Tr. at 33-34, *Budowich*, ECF 27; Order at 9 & n.12, *Eastman*, ECF 43; *Vander Jagt*, 699 F.2d at 1175.  The Select Committee and its subpoena are valid.

### B.  The Complaint Fails To State A First Amendment Claim

The Complaint alleges that the subpoena violates the Wards' rights under the First Amendment.  Compl. ¶¶ 46-59.  The Wards suggest that this Court must subject the subpoena to "exacting scrutiny" because "political associational rights are at stake."  *Id.* ¶ 50.

To the contrary, the subpoena does not implicate any "associational" activities of the Wards or their associates.  The subpoena does not seek the content of any communications.  Rather, the subpoena seeks "subscriber information" and "connection records and records of session times and durations."  Compl. Ex. A.  Subscriber information is limited to information about the user of the account, associated phone numbers, and other identifying numbers. "Connection records" and "records of session times and durations" simply refer to records of the date and time, duration, and sender and recipient of any call, text message, or other communication.[12]  None of this data reveals any speech or associational rights protected by the First Amendment.

_____

[12]  Connection Records and Records of Session Times and Durations are defined in the subpoena as: "All call, message (SMS & MMS), Internet Protocol ('IP'), and data-connection detail records associated with the Phone Numbers, including all phone

Further, even if the Wards' First Amendment claim were subject to a balancing test, such balancing would favor the Select Committee's crucial investigation. The Wards' conclusory assertions that the subpoena "provides the [Select] Committee with the means to chill the First Amendment associational rights" of the Wards' and "the entire Republican Party in Arizona," Compl. ¶ 52—and that the violation of Wards' First Amendment rights "would lead to substantial and serious injury and harassment," *id.* ¶ 54—are far too amorphous to be actionable. Courts require considerably more specificity than the Wards allege. *See Brock v. Loc. 375, Plumbers Int'l Union of Am., AFL-CIO*, 860 F.2d 346, 350 n.1 (9th Cir. 1988) (reviewing cases and concluding that courts have "emphasized in each of those decisions ... the need for objective and articulable facts, which go beyond broad allegations or subjective fears ... . [A] merely subjective fear of future reprisals is an insufficient showing of infringement of associational rights").[13]

Even if the Wards were able to substantiate a legitimate interest implicated by the subpoena, which they cannot, it would be greatly outweighed by the Select Committee's overwhelming interest here. The Select Committee's subpoena seeks records relevant to determining the root causes of the January 6th insurrection against Congress, a "violent attack[] on the seat of our nation's government" that resulted in the "deaths of several law enforcement officers" and "deepened public distrust in our political process." *Eastman v. Thompson*, -- F. Supp. 3d --, 2022 WL 894256, at *27 (C.D. Cal. Mar. 28, 2022). This is a paradigmatic example of the governmental interest in the "free functioning of our national institutions." *Buckley v. Valeo*, 424 U.S. 1, 66 (1976) (citation omitted), and as discussed above, *see supra* at 2-3, Dr. Kelli Ward played a role in the events leading up to that day.

_____

numbers, IP addresses, or devices that communicated with the Phone Number via delivered and undelivered inbound, outbound, and routed calls, messages, voicemail, and data connections." Compl. Ex. A. Contrary to the Complaint, *see id.* ¶ 52, the subpoena does not seek "file names of attachments."

[13] *See also Buckley v. Valeo*, 424 U.S. 1, 74 (1976) (associational injury requires demonstrating "a reasonable probability that the compelled disclosure … will subject them to threats, harassment, or reprisals from either Government officials or private parties"); *see also Doe No. 1 v. Reed*, 561 U.S. 186, 200 (2010); *Senate Permanent Subcomm. v. Ferrer*, 199 F. Supp. 3d 125, 143 (D.D.C. 2016), *aff'd*, 856 F.3d 1080 (D.C. Cir. 2017).

Any balancing of "the competing private and public interests at stake" thus plainly favors the Select Committee. *Barenblatt v. United States*, 360 U.S. 109, 126 (1959); *see* Order at 12-13, *Eastman*, ECF 43 (rejecting plaintiff's First Amendment claim); *Ferrer*, 199 F. Supp. 3d at 138-43 (same).

### C. Neither Arizona State Privilege Protections Nor HIPAA Apply

Lastly, the Complaint alleges that the information sought from T-Mobile violates Arizona state law prohibiting disclosure of medical and payment records in criminal and civil matters as well as HIPAA. *See* Compl. ¶¶ 60-73. Both claims are incorrect.

*First*, regarding Arizona state law, the Supremacy Clause of the U.S. Constitution, U.S. Const., Art. VI, cl. 2, precludes a state or local government from imposing restrictions on an entity of the Federal Government (such as the Select Committee) because doing so may interfere with the execution of the entity's federal functions. *See, e.g.*, *Mayo v. United States*, 319 U.S. 441, 445 (1943) ("A corollary to [the Supremacy Clause] is that the activities of the Federal Government are free from regulation by any state."). Accordingly, the Arizona state law cited in the Complaint cannot regulate components of the Federal Government.

Moreover, a Congressional subpoena is not part of either a "criminal matter" or a "civil matter." Rather, it is issued pursuant to Congress's constitutional power to conduct investigations "upon which legislation could be had." *See supra* at 6-7. Thus, by their plain language, neither of the Arizona statutes cited applies to the Select Committee's subpoena to T-Mobile.

*Second*, HIPAA does not apply to the Select Committee. Regulations promulgated under HIPAA require only that "covered entit[ies]" maintain certain medical records in confidence. 45 C.F.R. § 164.502. HIPAA's disclosure restrictions do not apply to this subpoena because neither the entity from which the records were sought—T-Mobile, a telecommunications carrier—nor the Select Committee or its Members fit within HIPAA's definition of "covered entity." 45 C.F.R. § 160.103.

A "covered entity" under the HIPAA regulations is defined as a "health plan," a "health care clearinghouse," or a "health care provider who transmits any health information in electronic form in connection with a transaction covered by" the HIPAA regulations. 45 C.F.R. § 160.103 (further defining "health care provider" as (1) hospitals, nursing, and rehabilitation facilities; (2) providers of "medical or health services;" and (3) any other person "who furnishes, bills, or is paid for health care in the normal course of business"). *Id.* T-Mobile does not fit this definition, nor does any Congressional entity or person.

Even if the source of the information were a health care provider rather than T-Mobile, the call detail records would not be covered under HIPAA because they do not contain "health information" as defined by the regulations, *see* 45 C.F.R. § 160.103, and they are not transactions covered by the regulations, *see, e.g.*, 42 U.S.C. § 1320d-2(a)(2); 45 C.F.R. § 160.103; *see also* 45 C.F.R. §§ 162.1101-162.1901 (providing definitions of all covered transactions except "first report of injury" and "health claims attachments").

*Finally*, to the extent the Wards' concern is public disclosure, the D.C. Circuit has recognized that "disclosure to Congress d[oes] not constitute 'public disclosure'" and that extensive deference is afforded to Congress to act responsibly with any information that it does obtain. *Exxon Corp. v. FTC*, 589 F.2d 582, 586 (D.C. Cir. 1978) (citation omitted); *see also id*. at 593 ("[T]he separation of powers demands that the courts do little to interfere with how the Congress deals with this information[.]"). Here, there is no reason to expect, and the Wards have provided none, that any personal medical information will be disclosed publicly by the Select Committee, which is investigating Dr. Kelli Ward's role in attempting to overturn the 2020 Presidential election, not her or her husband's roles as health care providers.

## CONCLUSION

For all the reasons stated above, the Complaint should be dismissed.

Respectfully submitted,

*/s/ Douglas N. Letter*
DOUGLAS N. LETTER
   *General Counsel*
TODD B. TATELMAN
   *Principal Deputy General Counsel*
ERIC R. COLUMBUS
   *Special Litigation Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
Telephone: (202) 225-9700
Douglas.Letter@mail.house.gov

August 8, 2022

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on August 8, 2022, I caused the foregoing document to be filed via the CM/ECF system for the U.S. District Court for the District of Arizona, which I understand caused a copy to be served on all registered parties.


*/s/ Douglas N. Letter*
Douglas N. Letter