1   Alexander Kolodin (SBN 030826)                    Laurin Mills (*pro hac vice*)
    Roger Strassburg (SBN 016314)              **Samek | Werther | Mills, LLC**
2   Veronica Lucero (SBN 030292)                            2000 Duke Street
    Arno Naeckel (SBN 026158)                                       Suite 300
3   **Davillier Law Group, LLC**                        Alexandria, VA 22314
4   4105 North 20th Street, Suite 110                         703-547-4693
    Phoenix, AZ 85016                       Email: laurin@samek-law.com
5   602-730-2985
6   Email: akolodin@davillierlawgroup.com
            rstrassburg@davillierlawgroup.com
7           vlucero@davillierlawgroup.com
8           anaeckel@davillierlawgroup.com
            phxadmin@davillierlawgroup.com (file copies)
9   *Attorneys for Plaintiffs*

10                IN THE UNITED STATES DISTRICT COURT
11                  FOR THE DISTRICT OF ARIZONA

12   Dr. Michael P. Ward, D.O., *et al.*;        Case No. 3:22-cv-08015-DJH
            *Plaintiffs*,
13                                               **PLAINTIFFS' RESPONSE TO SELECT**
     v.                                          **COMMITTEE'S MOTION TO DISMISS**
14                                               **(Oral Argument Requested)**
     Bennie G. Thompson, *et al.*;               **(Hon. Diane J. Humetewa)**
15          *Defendants*.

16          Defendants ask the Court to let them snoop through the telephone records of a rival

17   political party's state Chair so that they can identify every person who called or texted her

18   during the three-month period surrounding the last presidential election. Defendants seek

19   access to data that would allow them to determine which organizations and grass-roots

20   activists have a direct line to a swing-state party Chair in a presidential election year. If

21   the Court accepts Defendants' argument, it will chill both Arizona citizens and aligned

22   interest groups from working with or joining the Arizona Republican Party in the future

23   because every person Chair Ward was in touch with will be placed at risk for a call or visit

24   from federal Government investigators who are sharing information with a parallel DOJ

25   criminal investigation into the same subject matter.

26          The chill is compounded by the fact that some citizens who called Dr. Ward are her

27   patients and not political partisans. Dr. Ward's failure to protect her patients' privacy

28   rights would be a violation of HIPAA. Congressional investigators, however, take the

position that a law that Congress passed is no constraint on their investigation.

The laws do, however, apply to Congress. They prevent the subpoena from being enforced here for at least three reasons: (1) Courts have the power to adjudicate the lawfulness of a Congressional subpoena; (2) the Select Committee ignored LRCiv 12.1(c) – rendering this Court unable to hear or decide any of their 12(b)(6) arguments; and (3) Plaintiffs have stated plausible claims. Firstly, that enforcement of the subpoena would violate the First Amendment by striking at the heart of the ability of Chairwoman Ward and the AZGOP's members to associate freely with the Republican Party and ideologically aligned interest groups and actors. And secondly, that enforcement of the subpoena would violate HIPAA. For just as the Committee has ignored this Court's rules of procedure, it has ignored Congress's own laws regarding when, by whom, under what circumstances, and with what preconditions HIPAA protected patient health information ("PHI") can be obtained by third-parties. Defendants' Motion must be DENIED.

## FACTS

On January 24, the Select Committee ("Committee") issued a subpoena for Plaintiffs' phone records. Compl. Ex. 1 (ECF Doc. 1-1). The subpoena indiscriminately sought production of all call data records from any line on Plaintiffs' account for the period November 1, 2020-January 31, 2021. *Id*. In other words, investigators wanted to know everyone who called or texted Plaintiffs and when and for how long they communicated.[1]

Dr. Kelli Ward is both the chairwoman of the Arizona Republican Party ("AZGOP") and a practicing physician. Compl. ¶¶ 7, 49 (ECF Doc. 1). Her practice is exclusively in the field of medical weight loss. *Id*. ¶ 21. During the applicable time-period she used her Mole Medical line to conduct telemedicine visits, converse with her patients, talk to her family and friends, and for calls of a political nature. *Id*. ¶¶ 23-24.

The Committee is chaired by Dr. Ward's political rivals. *Id*. ¶ 52. If the subpoena is complied with, the personal telephone numbers and other contact details of patients,

---

[1] The Committee has recently withdrawn those portions of its subpoena that related to Dr. Michael Ward's line as well as the Wards' childrens' phone line. Mot. n.8.

family members, friends, and the party members most in communication with the AZGOP chair during one of the most contentious periods of modern political history would end up in the hands of these rivals who are criminalizing political participation. Every contact of Dr. Ward's is at risk for a call from Committee investigators or even a visit from the FBI.

**ARGUMENT**

**I.** *This Court has jurisdiction over this action.*

**a. This Court has inherent authority to quash a congressional subpoena.**

It is settled law that the authority that Courts possess to quash or modify grand jury subpoenas extends to congressional subpoenas. *Trump v. Mazars USA*, LLP, 39 F.4th 774, 787 (D.C. Cir. 2022) (holding that court had jurisdiction to consider President Trump's challenge to congressional subpoena). Indeed, as established by the Supreme Court during the McCarthy era, congressional subpoenas are susceptible to challenge in federal court on several grounds. These include that the subpoena is being "used to inquire into private affairs unrelated to a valid legislative purpose", that the subpoena extends "to an area in which Congress is forbidden to legislate," that the subpoena has been issued for "law enforcement" purposes," and that the subpoena violates one of the "specific individual guarantees of the Bill of Rights[.]" *Quinn v. United States*, 349 U.S. 155, 161 (1955). "The court must quash or modify the [Congressional] subpoena if it determines that the subpoena 'requires disclosure of privileged or other protected matter.'" *Comm. on the Judiciary of the United States House of Representatives v. McGahn*, 449 U.S. App. D.C. 1, 18 (2020) (citing Fed. R. Civ. P. 45(d)(3)); *Accord Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2032 (2020) ("*Mazars*") (explaining that these include constitutional privileges).

**b. Alternatively, this Court has jurisdiction to quash or modify the subpoena because T-Mobile is a party.**

In *Republican Nat'l Comm. v Pelosi*, a case that concerned a subpoena by the Committee to Salesforce (one of the RNC's email vendors), the District Court for the District of Columbia agreed with the Committee that individual members of Congress were generally immune from suit but resolved the quandary by "assum[ing] without deciding" that it could treat Salesforce "as a state actor" for the purposes of the dispute

over the legality of the subpoena, *Republican Nat'l Comm. v. Pelosi*, Civil Action No. 22-659 (TJK), 2022 U.S. Dist. LEXIS 78501, at *37 (D.D.C. May 1, 2022), and therefore hear and decide the underlying claims. Similarly, in *Mazars*, the Supreme Court had no compunction about asserting jurisdiction to decide the constitutionality of a congressional subpoena for President Trump's papers where the subpoena was directed against his accounting firm, Mazars USA, LLP, and Mazars was a party. *Mazars* at 2027-28; *see also Eastman v. Thompson*, No. 8:22-cv-00099-DOC-DFM, 2022 U.S. Dist. LEXIS 59283, at *43-44 (C.D. Cal. Mar. 28, 2022) (no jurisdictional issue with suit to quash subpoena by Committee where the entity holding the emails was also made a party).[2]

Here, Plaintiffs have likewise alleged that **both** "[t]he production of these documents by T-Mobile concerning the Phone Number, **and** the Subpoena upon which this production would be based" violate the First (and Fourteenth) Amendments, as well as the Physician/Patient privilege and other applicable laws such as HIPAA, *see, e.g.,* Compl. ¶ 4 (ECF Doc. 1), and have made T-Mobile a party.[3]

In any event, the *Pelosi* Court assumed correctly. Courts treat private parties as state actors, subject to the same claims that may be asserted against the government if it were a party, under four different sets of circumstances: (1) they are exercising a public function; (2) they are engaging in joint action with the government; (3) governmental compulsion or coercion is present; or (4) there is a governmental nexus. *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835-36 (9th Cir. 1999); *see also Brown v. Philip Morris, Inc.*, 250 F.3d 789, 801 (3d Cir. 2001) (using same analysis to determine whether a private party is a "federal actor"). Governmental compulsion or coercion is

---

[2] Although the issue of jurisdiction was not addressed in *Mazars* or *Eastman*, courts are required to act *sua sponte* to dismiss suits if jurisdiction is lacking. *Crowley v. Bannister*, 734 F.3d 967, 974 (9th Cir. 2013).

[3] Defendants state their Second through Fourth causes of action directly against the Committee and not against T-Mobile. However, to the extent this is relevant, this is easily curable by amendment. It would also have been curable had the Committee simply followed LrCiv 12.1(c) and met and conferred with Plaintiffs prior to filing their Motion to Dismiss.

obviously present here, as is a governmental nexus. T-Mobile was served with a congressional subpoena commanding it to produce Plaintiffs' documents, which but for that action it would not be compelled to produce. Thus, the Committee's attempt to invite the Court to reach the unnecessary question of whether the federal courts have jurisdiction over the Committee is a red-herring. *See Mills v. Rogers*, 457 U.S. 291, 305 (1982) ("It is this Court's settled policy to avoid unnecessary decisions of constitutional issue.").

## II. *The Committee failed to comply with LRCiv 12.1(c).*

For seven months, the Committee has been seeking extensions to respond to the Complaint, but not once in that time did the Committee seek to work with Defendants concerning the scope of the subpoena. LRCiv 12.1(c) provides that Rule 12(b)(6) motions may **not** "be considered or decided unless the moving party includes a certification that, before filing the motion, the movant notified the opposing party of the issues asserted in the motion and the parties were unable to agree that the pleading was curable in any part by a permissible amendment[.]" The Committee has repeatedly averred to this Court and the parties that it was "actively engaged in studying the various alternatives in this and other related litigation." *See e.g.*, (ECF Doc. 30) pg. 2:20-26, (ECF Doc. 32) pg. 2:24-3:6, (ECF Doc. 35) pg. 3:1-4. How then were Plaintiffs to know that they even planned to file a motion to dismiss, much less what the contents would be? Certainly not because the Committee met its conferral obligation - the Committee failed to attach the certification required by LRCiv 12.1(c) to its Motion. Thus, the only matter that can currently be heard or decided is the question of this Court's jurisdiction.

## III. *Though not properly before the Court, Plaintiffs have stated plausible claims.*

### a. Standard on a motion to dismiss pursuant to 12(b)(6).

To survive a Rule 12(b)(6) motion, a complaint must contain factual allegations sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The task "is to evaluate whether the claims alleged [plausibly] can be asserted as a matter of law." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**b.  The Complaint states a plausible First Amendment claim.**

Plaintiffs' Second Cause of Action alleges that the Subpoena violates their core First Amendment rights to associate with others for political purposes. An individual's First Amendment freedoms include a "correlative freedom to engage in group effort toward those ends." *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984), *see also Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010) (recognizing a First Amendment privilege). "Implicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Brock v. Local 375, Plumbers Int'l Union*, 860 F.2d 346, 349 (9th Cir. 1988) (internal citations omitted). The "inviolability of privacy in group association" is in many circumstances "indispensable to [the] preservation of freedom of association, particularly where a group espouses dissident beliefs." *NAACP v. Alabama*, 357 U.S. 449, 462 (1958). This is one of those circumstances.

When such core political associational rights are at stake, the Court must apply what the Supreme Court calls "exacting scrutiny." Exacting scrutiny requires that there be "a substantial relation between the disclosure requirement and a sufficiently important governmental interest, and that the disclosure be narrowly tailored to the interest it promotes." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2385 (2021). The exacting scrutiny standard applies when a litigant seeks to quash a congressional subpoena on First Amendment grounds. *See Pelosi* at *63 (citing *Bonta* at 2383, 2387). To satisfy this test, the subpoena must not cause an "unnecessary and unreasonable dissipation of precious constitutional freedoms" and "the investigative demand should not be substantially overbroad, meaning that a substantial portion of the information sought does not serve to advance the investigative goals." *Pelosi* at *62-63 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989), *Watkins v. United States* 354 U.S. 178, 204

(1957), *Bonta* at 2386).[4] The inquiry must be "calibrated to fit the distinct issues raised in the context of each case." *Id.* (citing *Grutter v. Bollinger*, 539 U.S. 306, 333-34 (2003)).

The Committee argues that, since the Subpoena only seeks call detail records, it does not implicate any associational activities of Plaintiffs or their associates and exacting scrutiny does not apply. Br. 14 (ECF Doc. 46). It further contends that, even if the Subpoena were subject to the exacting scrutiny standard, Plaintiffs' First Amendment associational concerns are too speculative and the investigative needs of the Committee outweigh those concerns. *Id.* at 15. Neither of those arguments is well taken and, even were it otherwise, the Committee fails to address the "narrow tailoring" requirement.

### *i. The Subpoena plainly impacts Plaintiffs' associational rights.*

The Committee's contention that a Subpoena that seeks the call detail records of the Chair of the AZGOP during the time of a contested presidential election does not implicate her First Amendment rights of political association is not a serious argument. "That telephone metadata do not directly reveal the content of telephone calls . . . does not vitiate the privacy concerns" arising out of the collection. *ACLU v. Clapper*, 785 F.3d 787, 794 (2d Cir. 2015). Telephone "[m]etadata can reveal civil, political, or religious affiliations . . . an individual's social status, or whether and when he or she is involved in intimate relationships." *Id.* Accordingly, "[w]hen the government collects [a party's telephone] metadata [the party and their associates'] interests in keeping their associations and contacts private are implicated, and any potential 'chilling effect' is created at that point." *Id.* 802-03 (going on to note that such collection confers standing to assert First Amendment claims). Indeed, Chairman Thompson, in a press release, has made plain that its investigation directly implicates associational activities, saying: "The inquiry includes examination of how various individuals and entities coordinated their activities leading up

---

[4] Internal quotations omitted from all citations in this paragraph.

- 7 -

to the events of January 6, 2021."[5] Another press release by Chairman Thompson explains that the Committee's stated goals are "Accountability under the law. Accountability to the American people. Accountability at every level: [down to] the local precincts in many states where Donald Trump and his allies attacked election workers for just doing their jobs."[6] *See Hutchinson v. Proxmire*, 443 U.S. 111, 133 (1979) ("newsletters and press releases" are "not entitled to the protection of the Speech or Debate Clause[.]"). In other words, the Committee seeks to expose and target not just the AZGOP's Chair, but its rank-and-file members and the scope of the inquiry goes far beyond the events in Washington on January 6. Not only are Plaintiffs' First Amendment rights implicated, the political associational rights of the entire AZGOP are at stake.

The *Pelosi* Court, in its analysis, pointed out the difference between the documents sought by the Committee's subpoena in that case and those sought in *Bonta*, saying "the Court there considered a challenge to a California regulation requiring tax-exempt organizations to disclose to the state **the names and addresses of certain donors**—information, unlike that here, that could directly chill individual associational rights." *Pelosi* at *58 (citing *Bonta* at 2380, 2387-88) (emphasis supplied). As set forth in section III(c) below, the records that the Committee seeks contain information that can easily be used to find the names and addresses of everyone who called Dr. Ward during a months'-long period of time. Thus, the information that the Committee seeks is exactly the sort of information that the *Bonta* court held presents the greatest threat of associational chilling.

Though *Pelosi* ultimately rejected the RNC's attempt to quash the Committee's subpoena on First Amendment grounds, it noted that "the RNC identified important First Amendment interests implicated by the subpoena **that would have presented a much**

---

[5] Press release available at: https://january6th.house.gov/news/press-releases/select-committee-subpoenas-organizers-rallies-and-events-preceding-january-6th (last accessed Aug. 22, 2022).

[6] Press release available at: https://january6th.house.gov/news/press-releases/thompson-cheney-luria-kinzinger-opening-statements-select-committee-hearing (last accessed Aug. 18, 2022).

**different question for the Court had the materials at issue not been narrowed** after discussions between the Select Committee and Salesforce." *Id* at *20 (emphasis supplied). *Pelosi* placed great weight on the fact that after negotiations, the Committee agreed not to seek "any disaggregated information about any of the RNC's donors, volunteers, or email recipients, including any person's personally identifiable information." *Id*. *25-26. Here, the Subpoena seeks disaggregated and personally identifiable information about everyone who called or texted Dr. Ward during a span of many months.

Public participation in politics is the life blood of our democracy. The criminalization of political activity, if not carefully constrained by the courts, will force legitimate political actors from the field. If the Committee gains access to Plaintiffs' call data records, virtually everyone Chair Ward talked to during the relevant time period is at risk to be contacted by Committee (or FBI) investigators and they will become implicated in the largest criminal investigation in U.S. history solely by virtue of the fact that they were in contact with the party Chair.[7] The chilling effect of that precedent on public participation in politics is palpable. The fact that the Committee is controlled by members of the rival political party, along with the existence of a parallel criminal investigation, also raises the legitimate concern that the Committee will use any information it obtains to harass or persecute political rivals by inquiring into their dealings with the party Chair.

In *NAACP v. Alabama*, Alabama sought the compelled disclosure of the NAACP's membership list. That compelled disclosure was significantly less intrusive than what the Committee seeks here. If the Committee prevails, it will get a list of who, when, and for how long the Chair of the AZGOP was in contact with party members at a sensitive time. This is exactly the sort of thing that may "induce members to withdraw" from the AZGOP "and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure." *NAACP* at 463

---

[7] Though the Committee might argue that whether such individuals will be contacted is speculative, how else is the Committee to know which individuals in the call records are political actors, which family and friends, and which patients?

(finding compelled disclosure under these circumstances to violate the First Amendment). Those in control of Alabama during the Jim Crow era would have drooled over the possibility of accessing such a trove of information about those they sought to persecute.

> ii. *Plaintiffs' First Amendment associational rights override the Committee's investigative needs for the information sought.*

Dr. Kelli Ward is the Chair of the AZGOP. It is her job to contact and coordinate with members of her party and associated interest groups about elections. Her responsibilities are especially acute when there is public controversy concerning the outcome of a presidential election. Such a controversy was raging in Arizona (and nationally) during the time-period covered by the Subpoena.

Here, there is no dispute that Plaintiffs perceived that there were "issues" with the 2020 presidential election results in Arizona and elsewhere and they acted to send an alternate slate of electors to Washington in the event that the legal challenges to the Arizona results succeeded. Their beliefs and the actions they took were no secret. Their vote was posted on YouTube and Dr. Kelli Ward wrote a book about it. https://www.amazon.com/Justified-Americas-Dr-Kelli-Ward/dp/195725503X (last accessed August 14, 2022). The connection between that action, which took place on December 14, 2020, and the riot at the Capitol on January 6, is far from obvious. Nevertheless, the Committee has swept any actor who had concerns about the 2020 presidential election into its causative narrative about January 6.[8]

The Subpoena seeks to discover with whom Plaintiffs communicated about 2020 presidential election concerns. That will inevitably lead to the questioning of, and further subpoenas issued to, the thousands of Republicans in contact with Plaintiffs. If the Subpoena is not quashed, members of the AZGOP will be made to feel that every time they communicate with party leadership, they risk having those communications disclosed to law enforcement followed by a knock on the door (or worse) from federal investigators. A stronger risk of associational chilling can scarcely be imagined.

---

[8] All assertions made in this paragraph are for the purposes of the instant motion only.

The idea that there were legitimate concerns about the 2020 election results is considered abhorrent by many. That fact, however, has no bearing on whether Plaintiffs are entitled to the protections of the First Amendment. "The hallmark of the protection of free speech is to allow 'free trade in ideas'—even ideas that the overwhelming majority of people might find distasteful or discomforting." *Virginia v. Black*, 538 U.S. 343, 358 (2003) (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)). Similarly, whether Plaintiffs' views are correct has no bearing on their entitlement to First Amendment protection. *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (citations omitted) ("It is now well established that the Constitution protects the right to receive information and ideas.... This right to receive information and ideas, regardless of their social worth, is fundamental to our free society.").

Neither the controversial nature of Plaintiffs' views nor their merit gives the Committee the right to disregard the core First Amendment rights of those who believe there was election fraud in 2020 and who engaged in political actions and discussions based on that belief. Yet, that is exactly what the Subpoena is designed to do. Allowing the Subpoena will forever chill the ability of partisan political actors to discuss and/or coordinate political activities in the wake of a close election. The attempt to criminalize partisan political activities via an intrusive investigation of political actors poses a greater threat to our democracy than the Capitol Riot.

The Committee advances no argument as to why any of the subpoenaed information is particularly important to its investigation (much the less why it requires **every single person** who called or texted Dr. Ward during a prolonged period of time to be identified). It fails to explain why it cannot obtain the material it needs from other sources, including publicly available sources, such as Dr. Ward's book. The Committee's argument is that the investigation itself is "important." Therefore, anything the Committee seeks is justified. This hardly satisfies exacting scrutiny and provides no basis for dismissing Plaintiffs' First Amendment claim.

### c. The Subpoena violates HIPAA.

Congress is bound by its own laws. *See Wilkinson v. Legal Servs. Corp.*, 27 F. Supp. 2d 32, 48 (D.D.C. 1998) ("[F]ounding principle of this Republic" and requirement of the Due Process clause that all government officials are bound by the law). "Congress has spoken on the privacy of medical records through HIPAA." *Nat'l Abortion Fed'n v. Ashcroft*, 2004 U.S. Dist. LEXIS 4530, at *19-20 (S.D.N.Y. Mar. 18, 2004). The Committee does not dispute that, if HIPAA applies, then the Subpoena cannot be enforced. Instead, it argues that HIPAA does not apply at all for two reasons.

First, the Committee argues that HIPAA does not apply because the information sought in the Subpoena does not constitute PHI within the meaning of HIPAA. Br. 17:9-14. Second, it argues that "HIPAA's disclosure restrictions do not apply to this subpoena because neither the entity from which the records were sought – T-Mobile . . . nor the Select Committee . . . fit within HIPAA's definition of 'covered entity.'" *Id*. 16:24-28.

Those assertions are wrong. The telephone numbers of Dr. Ward's patients can easily be used to identify them. For this reason, HIPAA presumes patient telephone numbers to be PHI in the absence of an expert opinion otherwise. And HIPAA governs the disclosure, not because Defendants are covered entities but because Plaintiffs are.

### i. The Subpoena seeks PHI.

When a patient seeking treatment for medical weight loss calls their doctor, the last thing they expect to happen is for the record of that call to be reviewed by a congressional investigator. In the absence of a protective order, such a patient might face uncomfortable questions from friends, reporters, and the public about why they are listed. For example, such patients could face the uncomfortable choice of admitting that they were seeking treatment for medical weight loss or living with the implication that they might have been partially responsible for the Capitol Riot.

Fortunately, Plaintiffs' patients need not face such a choice because the patient telephone numbers in T-Mobile's possession constitute "individually identifiable health information" ("PHI") that HIPAA protects from disclosure. PHI is defined as follows:

*(6) INDIVIDUALLY IDENTIFIABLE HEALTH INFORMATION.— The term 'individually identifiable health information' means any information,*

> *including demographic information collected from an individual, that—*
>> *(A) is created or received by a health care provider, health plan, employer, or health care clearinghouse; and*
>> *(B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and—*
>>> *(i) identifies the individual; or*
>>> *(ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.*

42 U.S.C. § 1320d(6); *see also Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, HHS.gov ("HHS Guidance")[9] (phone numbers that "indicat[e] that the individual was treated at a certain clinic" are PHI). Here, there is a "reasonable basis" to believe that the telephone numbers of patients in T-Mobile's "metadata" files can be used to identify individual patients and expose their personal, medical information for at least three reasons.

First, it is a trivial task to look up the name of a caller once someone knows their telephone number. For example, performing a Google search for undersigned counsel's cellphone number yields, on the first page of results, a bevy of information from FastPeopleSearch.com including his name, address, previous addresses, the name of his wireless carrier, email addresses, aliases, relatives, and known associates. **Exh. 1**. If users wish to learn more, they are invited to purchase a "Full Background Report". Indeed, telephone metadata implicates a variety of privacy concerns. As reported in Mayer, et al., "Evaluating the privacy properties of telephone metadata" (2016), computer science researchers at the Security Laboratory in the Department of Computer Science at Stanford University demonstrated that telephone metadata can be readily reidentified to reveal the identity of an individual, like a patient, and can be used to discover personal health information. **Exh. 2** (the "Mayer Study"). The Mayer Study found that, "[T]elephone

---

[9] Available at https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last accessed Aug. 18, 2022).

numbers are trivially reidentifiable." *Id*. at 5538. After selecting a sample size of 30,000 phone numbers, the researchers found that searches using free, public interfaces matched identities for 32% (9,576) of the numbers with individuals. Using both manual and automated searches, the researchers were able to match 82% of the numbers with individuals. *Id*. at 5540, Table 2. Moreover, the researchers were able to connect individuals with a number of health organizations whose specialties disclosed the nature of the individual's health. *Id*. at Table 5. The researchers concluded that "Telephone metadata is densely interconnected, easily reidentifiable, and trivially gives rise to location, relationship, and sensitive inferences." *Id*. Additionally, it seems blindingly obvious that the file name of an attachment sent to Dr. Ward by a patient could constitute PHI (*e.g.*, a file name like "photo of my belly fat").

Second, metadata identifying patient telephone numbers calling the Wards' medical practice identifies the nature of the patient's health condition because of Dr. Kelli Ward's single specialty of weight loss, no less than the telephone numbers of patients calling an oncologist would similarly disclose the nature of the patient's cancer condition. *See Clapper* at 794 (noting that the fact of a call itself to a single-specialty provider may reveal whether someone is "a victim of domestic violence or rape; a veteran; suffering from an addiction of one type or another; [or] contemplating suicide[.]").

Third, in the absence of an expert determination otherwise, HIPAA **presumes** that patient telephone numbers are PHI and requires that they be redacted prior to disclosure to comply with HIPAA's "safe harbor" requirements for de-identified medical information. *See* HHS Guidance (citing 45 CFR § 164.514). There are few restrictions on the use or disclosure of de-identified health information. *See* 45 C.F.R. §§ 164.502(d)(2), 164.514(a) and (b). The de-identification safe harbor rule requires removal of metadata of the kind sought by the Committee here: The safe harbor rule (45 C.F.R. § 164.514(b)(2)(i)(A)-(Q)) requires removal of certain items of information--items that would appear in the metadata in the possession of T-Mobile and sought by the Committee – including telephone numbers, fax numbers, names, addresses, zip codes, email addresses, and internet protocol

(IP) addresses. Since the T-Mobile metadata includes such information, it could not qualify for the "safe harbor" of de-identified information protected by HIPAA.

> ii.  *HIPAA applies because the Committee has subpoenaed information from a covered entity.*

"HIPAA provisions provide for disclosure of medical information in the course of a judicial proceeding, but certain requirements are placed on the provider **and the party seeking the information**." *Montoya v. Arizona*, No. CV 18-08025-PCT-DGC (ESW), 2019 U.S. Dist. LEXIS 172561, at *2-3 (D. Ariz. Oct. 4, 2019) (emphasis supplied); *Accord Pyankovska v. Abid*, No. 2:16-cv-02942-JCM-PAL, 2018 U.S. Dist. LEXIS 233418, at *17-18 (D. Nev. Oct. 16, 2018), *Crenshaw v. Mony Life Ins. Co.*, 318 F. Supp. 2d 1015, 1028-29 (S.D. Cal. 2004). Similarly, when the government subpoenas PHI from a covered entity and no state law privilege applies, "[t]he privacy provisions promulgated under HIPAA . . . control the enforceability of the subpoena." *Nat'l Abortion Fed'n* at *19-20; *see also Crenshaw v. Mony Life Ins. Co.*, 318 F. Supp. 2d 1015, 1028 (S.D. Cal. 2004). "HIPAA, through its implementing regulations, speaks directly to the privilege" in this context. *Nat'l Abortion Fed'n* at *20.

HIPAA requires that the party serving the subpoena to either (a) obtain patient consent or (b) seek a qualified protective order. *Nat'l Abortion Fed'n* at *21-22 (citing 45 C.F.R. § 164.512(e)); *Accord Henderson v. Cty. of Santa Cruz*, No. 14-cv-03544-WHO, 2020 U.S. Dist. LEXIS 60271, at *2-3 (N.D. Cal. Apr. 6, 2020), *Montoya* at *2-3, *Pyankovska* at *17-18, *Kelso v. Redding Police Dep't*, No. 2:11-cv-1960-KJM-CMK, 2012 U.S. Dist. LEXIS 178250, at *3-4 (E.D. Cal. Dec. 17, 2012), *Crenshaw* at 1028-29. A qualified protective order must (a) prohibit the parties from using or disclosing the protected health information from any purpose other than the litigation or proceeding for which such information was requested and (b) require the return to the covered entity or destruction of the protected health information (including all copies made) at the end of the litigation or proceeding. *Henderson* at *2-3, *Crenshaw* at 1028-29, *Pyankovska* at *17-18, *Kelso* at *3-4. Though the Committee was placed on notice of this at the outset of this case, Ps.' Mot. to Quash 9:12-24 (ECF Doc. 2), it has neither disputed that these are the

requirements if HIPAA applies nor moved to secure a qualified protective order.

The Committee instead simply argues that HIPAA does not apply here because neither it nor T-Mobile "fit within HIPAA's definition of a covered entity." Mot. 16:24-28. However, as set forth in Section I(b), above, T-Mobile is a state actor in this context. Whether **it** is a "covered entity" is irrelevant. A state actor is simply treated as if it were the state itself. *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974). And, even were T-Mobile not a state actor, litigants may still assert their privileges in situations where subpoenas have been served to non-parties. *Orthoflex, Inc. v. ThermoTek, Inc.*, No. 12-MC-00013-PHX-JAT, 2012 U.S. Dist. LEXIS 42417, at *4 (D. Ariz. Mar. 28, 2012).

In harmony with these concepts, *Eastman* rejected the "sweeping proposition" that using a third-party communications provider that complies with subpoenas constitutes a waiver of applicable privileges. *Eastman* at *43-44. Thus, while the Committee correctly identifies itself as the party seeking the information, it fails to properly identify Plaintiffs as the true parties from whom the information is sought. Because Plaintiffs **are** a covered entity, HIPAA applies.

HIPAA's application, on its own, simply requires the Committee to secure a qualified protective order. Such a protective order would not impede the Committee's investigation. Rather, it would prevent the Committee from using the information received for anything **other** than its investigation (and prohibit it from leaking the PHI to the public or other government entities). To be sure, it would preclude the Committee from sharing PHI with the Justice Department, but "Congress may not issue a subpoena for the purpose of law enforcement" anyway "because those powers are assigned under our Constitution to the Executive and the Judiciary." *Mazars* at 2032 (quotations omitted).[10]

### d.  The Committee's other 12(b)(6) arguments fail.

The Committee, relying on *Trump v. Thompson* (and oral argument transcripts from other cases) argues that "four other courts" have rejected arguments that the subpoenas

---

[10] If the DOJ requires access to this information, HIPAA contains specific previsions by which law enforcement may subpoena PHI under limited conditions.

issued by the Committee lacked a legitimate legislative purpose. Br. 6. But Thompson did not overrule *Watkins's* clear command that, where challenged, Congressional subpoenas must be shown, with "undisputable clarity," to relate to an authorized and lawful purpose of the Committee's legislative investigation. *See Watkins* at 214-15 (going on to state "[t]o be meaningful, the explanation must describe what the topic under inquiry is and the connective reasoning whereby the precise questions asked relate to it."). To the contrary, the *Thompson* Court relied heavily on *Watkins*. *Thompson*, 20 F.4th at 24-25. *Thompson's* reason for finding the valid legislative purpose test was satisfied was that the Committee provided "detailed and substantial evidence" in that case of its "specific need" for the records it was seeking. *Id.* at 42. What's more, in *Thompson*, the Committee made a far more specific request, seeking only presidential records pertaining to the events of January 6th, the former President's claims of election fraud, and other, related, items. *Id*. at 16.

Here, by contrast, the Committee has made, at best, vague assertions that all Plaintiffs' phone records for a three-month period of time are required for its investigation. This falls far short of "substantial evidence" of a "specific need". The Committee was, indeed, so scattershot that, originally, it mistakenly subpoenaed the records for Dr. Ward's husband and children as well.

Additionally, Plaintiffs continue to maintain that the Committee was not constituted and does not operate in conformity with the House rules for the reasons stated in the Complaint and Motion to Quash and the Committee has advanced no reason for overlooking the plain text of the rules. As set forth above, neither this, nor any other 12(b)(6) issue is yet properly before the Court. Given the limitations of space, Plaintiffs will address these, and the Committee's other arguments, at the appropriate time and after any necessary refinement subsequent to conferral.

## CONCLUSION

For the forgoing reasons, the Motion to Dismiss should be DENIED or, alternatively, leave to amend subsequent to conferral should be granted.

Respectfully submitted this 22nd day of August 2022

/s/ *Alexander Kolodin*
Alexander Kolodin
Roger Strassburg
Veronica Lucero
Arno T. Naeckel
**Davillier Law Group, LLC**
4105 North 20th Street
Suite 110
Phoenix, AZ 85016

/s/ *Laurin Mills*
Laurin Mills
**SAMEK | WERTHER | MILLS, LLC**
2000 Duke Street
Suite 300
Alexandria, VA 22314
(*Pro hac vice*)

## CERTIFICATE OF SERVICE

I certify that on August 22, 2022 I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, which electronically sends a copy to be served on all registered parties.

*/s/ Alexander Kolodin*